**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| Kimberley Eden Steele, M.D., Ph.D.<br><br>Plaintiff,<br><br>v.<br><br>The Johns Hopkins Health System Corporation,<br>Johns Hopkins Bayview Medical Center, Inc.,<br>and The Johns Hopkins University/The Johns<br>Hopkins University School of Medicine,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 19-3628<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT AND JURY DEMAND

Plaintiff Kimberley Eden Steele, M.D., Ph.D., ("Dr. Steele") is a board-certified minimally invasive and bariatric surgeon. From 2006 to 2019, she served on the faculty of the Johns Hopkins University School of Medicine and was a member of the Medical Staff primarily at the Johns Hopkins Bayview Medical Center, with privileges at the Johns Hopkins Hospital. She came to Hopkins in 2005 as a fellow and then joined the Medical Staff.

Dr. Steele's clinical acumen and her original research have been widely recognized by her peers. She has been admitted as a Fellow to the American College of Surgeons as well as to the American Society of Metabolic and Bariatric Surgery ("ASMBS"). She is a Diplomate of the American Board of Obesity Medicine. In addition, she has been awarded significant grants from the National Institutes of Health ("NIH"), the ASBMS, and private industry. Beyond her skill as surgeon and potential impact of her academic pursuits, Dr. Steele has been touted for her devotion to her patients and those whom she has trained over the years.

Despite her plain talent and drive, during her fellowship and as a young surgeon, while her male counterparts socialized with their senior colleagues, she was asked to stay behind and do their work.  She endured sexualized comments and conduct.  As she became more independent, she was told her hands were perhaps too small to control equipment; her style was sometimes too emotional.  When she had the temerity to start a family as she pursued her career, she was told by departmental leadership at Bayview that women were never good surgeons once they had children, and she came back from maternity leave to find that her access to surgical time was reduced and her patients reassigned.  She was told to focus on research and, even then, was marginalized further as she succeeded.

Dr. Steele raised concerns about the mistreatment she faced.  Instead of redress, she faced punishment, as those who were comfortable with the status quo engaged in a steady and long campaign to punish her for getting out of line.  Those who saw what was happening to her – including some well-respected senior faculty at Hopkins – were shut out and shut down.

In this context, when Dr. Steele was obliged to call out safety concerns and problems with federal grant administration, she was further diminished and demeaned.  She faced increasingly disparate treatment, cynical ploys to undermine her standing and clinical reputation, and concerted efforts to make *her* the problem.   Thus, although male surgeons in her department at Bayview yelled and had emotional meltdowns in the operating rooms, with one surgeon (who was later promoted) known to have thrown a bloody instrument at a drug representative during a surgical procedure, it was she who was labeled "difficult" and "emotional."

Then, when Dr. Steele asked to take time away from work to care for her young child who faced a life-threatening illness, the leadership at Bayview – backed by Hopkins – saw an

opportunity.  She was told she could have the time – although she would give up all the rights she had earned based on her professorial rank.

As painful as it was, Dr. Steele returned without taking the time her family needed.  Even so, she was further marginalized and punished for her raising concerns about the treatment she faced.  Ultimately, Hopkins terminated Dr. Steele's employment and her Medical Staff appointment and privileges.  Her last day at Hopkins was December 15, 2019.

In the end, this case is about the persistent and corrosive gender bias Dr. Steele faced as a woman surgeon at Hopkins, and the punishing campaign against her when she had the temerity to raise concerns about it.  It is about the derailing of Dr. Steele's promising career and about the redress the Defendants denied her, which she must now seek from this Court.  The cost to her career and to her personally has been – and continues to be – significant.

She now comes before this Court seeking redress.

<u>JURISDICTION AND VENUE</u>

1.      All administrative prerequisites have been met for maintaining this action.  This Court has jurisdiction over the claims alleged pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

2.      Venue is proper in this Court as, on information and belief, all Defendants reside in this judicial district.

<u>PARTIES</u>

3.      Plaintiff Kimberley Eden Steele, M.D., Ph.D., FACS, FASMBS, DABOM ("Dr. Steele") is an individual who resides in Baltimore City, Maryland.   She is a clinician-scientist and bariatric surgeon.  She has been admitted as a Fellow to the American College of Surgeons

as well as to the American Society of Metabolic and Bariatric Surgery.  She is a Diplomate of the American Board of Obesity Medicine.

4.      Defendant The Johns Hopkins University (the "University") is a Maryland corporation organized under the laws of the State of Maryland.  The University's principal place of business is 242 Garland Hall, 3400 N. Charles Street Baltimore, Maryland 21218.  The Johns Hopkins University School of Medicine ("School of Medicine") is a division of the University.

5.      Defendant Johns Hopkins Bayview Medical Center, Inc., ("Bayview") is a Maryland corporation organized under the laws of the State of Maryland.  Bayview's principal place of business is 4940 Eastern Avenue, Baltimore, Maryland 21224.  Bayview is owned by The Johns Hopkins Health System Corporation.  Bayview is a teaching hospital of the School of Medicine, where all of its physicians are full-time faculty.

6.      Defendant The Johns Hopkins Health System Corporation, (the "Health System") is a Maryland corporation organized under the laws of the State of Maryland.  The Health System's principal place of business is located at 600 N. Wolfe Street, Baltimore, Maryland 21287.  Johns Hopkins Medicine is a registered trade name of the System and is a partnership between the Health System and the School of Medicine.

7.      Collectively, the University, the School of Medicine, Bayview and the Health System, hereinafter, shall be referred to as "the Defendants," "Hopkins" or "Johns Hopkins."

## FACTS

8.      Dr. Steele is a surgeon with a specialty in minimally invasive and bariatric surgery for those suffering with chronic obesity.  She came to Hopkins in 2005 as a Fellow in minimally invasive and bariatric surgery.

9.      Dr. Steele was invited onto the Medical Staff by Dr. Julie Freischlag, ("Dr. Freischlag") the then-Chair of the Department of Surgery (the "Department") and surgeon-in-chief at Johns Hopkins Hospital.

10.     Dr. Steele was first appointed to the position of Instructor in General Surgery at the School of Medicine and then promoted to the rank of Assistant Professor in 2007.  Dr. Steele maintained privileges at Bayview and Johns Hopkins Hospital.  She was employed by Hopkins.

11.     Dr. Steele's work environment at Hopkins was largely determined by her experience at Bayview.

12.     At the time she joined the Department, the then Chair of the Department of Surgery was Dana Anderson, M.D. ("Dr. Anderson").  In 2010, Thomas H. Magnuson, M.D., ("Dr. Magnuson") became the Chair of the Department of Surgery at Bayview, and was an Associate Professor of Surgery in the School of Medicine.

13.     Michael A. Schweitzer, M.D., ("Dr. Schweitzer") was the Director of the Johns Hopkins Center for Bariatric Surgery located at Bayview, an Associate Professor of Surgery in the School of Medicine, and the Co-Director of the Bariatric Fellowship program.

14.     At Dr. Steele's first annual review with Dr. Freischlag, her Chair remarked that she was pleased that Dr. Steele was at Bayview because she hoped that she could help to "tame" her male colleagues there.   Dr. Freischlag herself was viewed cynically by the male surgical leadership at Bayview.  At least one of them referred to Dr. Freischlag as Dr. Steele's "fearless female leader."

15.     As for the way the male surgeons treated Dr. Steele, from the outset of her tenure at Bayview, she faced stereotyped expectations and attitudes as well as inappropriate conduct.

16.     When young male surgeons left to socialize with senior male colleagues, Dr. Steele was expected — without complaint — to take whatever call they did not wish to take. She was left to work undesirable shifts as they built the relationships that would – and did – grease the skids for future assignments and research collaborations.

17.     Dr. Steele was expected to respond to requests for assistance at all hours, even when she was not on call.  She was expected to endure without complaint communications from Dr. Schweitzer, her supervisor, laced at times with inappropriately sexually-charged language.

18.     On more than one occasion, Dr. Schweitzer came to Dr. Steele's office to brag about his workouts in the gym.  As he did, he would lean into Dr. Steele.  His conduct was uncomfortable and certainly unwelcome, as Dr. Steele tried to make it clear by her response.

19.     Dr. Steele hoped that eventually, with time and hard work, she could move beyond this dynamic.  She worked long hours, saw high numbers of patients, and performed a large number of surgeries.

20.     Dr. Steele became the Clerkship Preceptor for medical students and was the Associate Director of the Surgical Clerkship.   In addition, she directed the surgical resident labs and created didactic curricula for the residents.

21.     In 2008, Dr. Steele became pregnant.  She was delighted and wanted to make sure to give the Department time to plan for her medical leave.  Accordingly, she met with Dr. Anderson to inform him of her impending need for a leave.

22.     Her Chair's response was shocking, and reflective of the culture at Bayview: he told Dr. Steele that she would never be as good of a surgeon once she had children.

23.     This sentiment was echoed by the administrator of the Bayview Department of
Surgery who also pulled Dr. Steele aside — as though to offer her friendly advice — and
informed her that it was not wise to have children and that it would "ruin your career."

24.     Dr. Steele was aware of Dr. Anderson's biased view of women more generally:
At a departmental meeting, he had commented negatively about the use of a device saying that it
was "as good as a woman — they never get the job done right."

25.     During her pregnancy, Dr. Steele's skills as a surgeon were called into question in
a way they had not been before.  For instance, a senior male anesthesiologist with whom she
worked commented on her pregnancy on multiple occasions and asked, snidely, if she could
complete the procedure or whether he should "call one of the guys."

26.     The stereotyping of Dr. Steele as a pregnant woman who could not also be a
capable surgeon also came from her direct supervisors. In or around the summer of 2008, Dr.
Magnuson told Dr. Steele that he and Dr. Anderson required that she visit the Faculty Assistance
Program ("FASAP") because she had become "emotional" since becoming pregnant.

27.     Dr. Steele was disturbed by this requirement, but complied and visited FASAP in
October 2008.  The evaluation raised no concerns about her conduct or emotional state and she
continued to see patients and operate until the time that she went out on leave and gave birth.

28.     Dr. Steele's first child was born on May 13, 2009 and she took time off as
permitted under the federal Family Medical Leave Act ("FMLA").

29.     While her formal position was maintained during her FMLA-protected leave, the
reception upon her return telegraphed that the Department was going to do what it could to
affirm its stereotypes about women surgeons with children and to punish her for taking leave.

30.     There were snide comments about her parenting leave, such as when Dr. Anderson asked how her "vacation" was.  But, more tellingly, there were meaningful changes to the conditions of her employment.

31.     Upon her return from leave, the amount of time available for Dr. Steele to book surgeries in the operating room (known as "block time") was materially reduced, and she was told that she would have to "prove herself worthy of further block time."  Her locker in the OR locker room and her parking space were no longer available to her.  Dr. Steele's role teaching medical students was reassigned to another physician.

32.     And although there were cases she had scheduled to complete upon returning from leave, many had been reassigned to other surgeons although, from the initial planning, it had always been forecast that she would return by the date of those scheduled surgeries.

33.     Then, despite having limited Dr. Steele's opportunities clinically, Dr. Anderson and Dr. Magnuson *increased* the number of cases they expected Dr. Steele to perform.

34.     Dr. Magnuson, who is also a bariatric surgeon and was formerly in Dr. Steele's Department, took over from Dr. Anderson as Chair of Surgery at Bayview in 2010.

35.     Because of this treatment when she returned from leave, Dr. Steele looked for support from FASAP and met with the same counselor to seek assistance.  On information and belief, the FASAP counselor reported concerns about gender discrimination in both the work environment and the way Dr. Steele was being treated.

36.     Four months after returning from her first maternity leave, Dr. Steele again became pregnant.  Again she worked through her pregnancy and again she responsibly informed her supervisors of her need to take a leave.  Her second child was born on July 14, 2010.

37.     Following her return from her second FMLA-protected leave, Dr. Steele was again treated harshly and deprived of the resources needed to manage her practice.  Her block time was even further reduced, and again, surgeries scheduled to occur after her return had been assigned to others.  She faced snide comments, condoned in this atmosphere.  For instance, she was asked by an administrator within her department at Bayview whether she should be at home "barefoot and pregnant in the kitchen working on the third?"

38.     Dr. Steele was concerned about the dynamic at play here.

39.     She met with Dr. Freischlag and spoke to her about the disparate treatment and limiting stereotypes she confronted as she tried to return to her surgical career after having children.  In the course of their conversation about gender bias, Dr. Freischlag indicated that she may need to move Dr. Steele out of Bayview.  Dr. Freischlag also made another suggestion designed, she said, to insulate Dr. Steele from that environment.

40.     Dr. Steele was encouraged to increase her focus on research and to apply for a grant from the National Institutes of Health ("NIH") to fund her research interests.  The suggestion was clear: expanding her research profile would make her less vulnerable to her senior male colleagues' control of her clinical activities and work environment.

41.     On information and belief, while Dr. Freischlag attempted to assist Dr. Steele in navigating the discriminatory work environment, Hopkins declined at this time to conduct any investigation into the concerns about bias Dr. Steele expressed.  However, on information and belief, Hopkins leadership did inform the leadership at Bayview of Dr. Steele's complaints regarding bias.

42.     Dr. Steele followed Dr. Freischlag's advice, and, in 2011, was awarded a highly competitive NIH grant.

43.     Consistent with the grant's terms, Dr. Steele enrolled at The Johns Hopkins School of Public Health to pursue a Masters of Health Science degree.  Pursuant to the grant, she was to devote 25% of her time to clinical activities with the remaining time protected for educational and research activities.   The Department of Surgery was required to – and did – sign off on this allocation of Dr. Steele's efforts.

44.     Notwithstanding, after Dr. Steele was awarded this NIH grant and after the Department had reallocated the block time available for Dr. Steele to conduct surgeries during the day (consistent with award), Dr. Magnuson informed Dr. Steele that – whatever the institutional promises made to NIH – he expected her to spend at least 50% of her time on clinical efforts.

45.     On information and belief, the demand made upon Dr. Steele reflected the resentment of the surgical leadership at Bayview that Dr. Steele and her "fearless female leader" had arranged for her continued professional growth.

46.     Bayview's demand – inconsistent with the promises Hopkins had made to the federal government in support of the grant application – put Dr. Steele in the position of having to schedule elective bariatric procedures in off-hours to meet Dr. Magnuson's demand.

47.     Dr. Steele registered her concern about this arrangement and its inconsistency with the grant's terms.  She met with Drs. Magnuson and Schweitzer.

48.     Dr. Schweitzer's response was this: He told Dr. Steele to close the door to the conference room when they met.  He then raised his voice and told her that she did not know when to "shut up, shut the f*ck up, stop complaining and keep quiet."

49.     On information and belief, at the time of their meeting, Dr. Schweitzer was aware of Dr. Steele's having raised concerns about gender bias in his Department.

50.     Despite the headwinds, Dr. Steele pushed forward.  In 2012, she received the Medical Student Faculty Teacher of the Year Award.  Dr. Schweitzer had no control over who received this award.

51.     In or around this same time period, Dr. Freischlag asked Dr. Steele to take on a leadership position as the Associate Director of the Center for Surgical Trials and Outcomes Research ("CSTOR").

52.     Dr. Steele successfully finished her Masters' Degree and was invited to pursue her Ph.D. by a research mentor, Dorry Segev, M.D., Ph.D. ("Dr. Segev").  Taking up Dr. Freischlag's suggestion that she focus on her research profile as a way of working around the clinical environment in which she found herself, Dr. Steele accepted this offer and continued her combination of research and clinical work.

53.     Yet Drs. Schweitzer and Magnuson continued to erect barriers to Dr. Steele's success, on information and belief, motivated now not only by bias but also by a desire to punish Dr. Steele for speaking up about the treatment she faced.

54.     For instance, Dr. Steele continued having little or no operating room block time during normal business hours.

55.     Additionally, Dr. Steele was excluded from working with the Department's fellow, who frequently assisted with more complex surgical procedures and she was routinely – and disparately – relegated to use the oldest equipment and the smallest operating room available at Bayview.

56.     Although working with a fellow was something male colleagues often sought, as the support offered by fellows allowed them to operate more efficiently, when Dr. Steele asked to be allowed the same support, she was derided and asked if she lacked the confidence to handle

11

her procedures on her own.  On information and belief, no male surgeon who worked with fellows had his abilities so questioned when he sought to enhance his surgical team with support from a fellow.

57.     Moreover, the assignment of patients who came to Hopkins for bariatric services began being skewed in such a way as to diminish Dr. Steele's surgical practice.

58.     Dr. Schweitzer served as the gatekeeper in charge of assigning patients who would come into the practice generally for bariatric services.  It was at his direction that such patients were assigned to particular physicians for treatment and, on information and belief, it was at his direction that Dr. Steele was assigned patients in a way that would make it difficult for her to meet expectations for surgical productivity.

59.     Dr. Steele's patient census has been affected otherwise as well.  Over time, after she returned from maternity leave, Dr. Steele has learned *from some patients and referring physicians* that at least some *patients who specifically sought her care* were steered away from her, with false statements regarding her clinical availability.

60.     It was in this context that, in or around 2012, Dr. Schweitzer began to raise concerns about Dr. Steele's clinical productivity.

61.     In the fall of 2012, Dr. Steele again contacted Dr. Freischlag to discuss her work environment.  In the end, a meeting was held but it was not simply between Dr. Freischlag and Dr. Steele.  Instead, it included Dr. Magnuson and Dr. Schweitzer, who seemed irate, lurching forward and pounding his fist on the table, as he criticized Dr. Steele for stepping out of line.  On information and belief, Hopkins declined at this time to conduct any investigation into the concerns about bias Dr. Steele expressed.

62.    Dr. Steele was demoralized but determined simply to do more to try to meet their uniquely harsh expectations.  But having raised concerns triggered further consequences.

63.    Shortly after that meeting, however, things got worse, as the leadership at Bayview made it clear that they did not appreciate Dr. Steele raising concerns about their treatment of her with Dr. Freischlag.  Indeed, Dr. Schweitzer called Dr. Steele to his office.  His animus was not left to inference any more.  He stated: "you think you are going to tell on me to my boss?  I'm going to make your life hell."

64.    Dr. Steele was shocked and frightened by Dr. Schweitzer's threatening statement. Dr. Steele heard the message and tried to keep her head down and just do her work.

65.    Dr. Steele received a highly competitive grant from the National Institutes of Health, providing support for the career development of investigators who are focused on patient-oriented research.  She was nominated for the prestigious Johns Hopkins Clinician Scientist Award, which she received in 2014.  This award was also renewed from 2015 to 2016.

66.    With a Ph.D., significant grant funding, and a successful research program recognized outside of Hopkins, in 2014, the School of Medicine was fairly obliged to promote her yet again, now to the status of Associate Professor.

67.    Dr. Magnuson – who had held up her promotion for two years, on information and belief – was now obliged to advance the promotion.

68.    As Dr. Steele began to succeed in this difficult environment, the push back against her increased.  When she did what any physician is obliged to do and raised good faith and real safety concerns, she was faulted for an absence of "civility."

69.    This was a particularly stunning charge in a Department where her male colleagues have yelled at staff, belittled medical students and residents (sometimes in unlawfully

13

biased ways) and – like Dr. Schweitzer – even gotten themselves into physical altercations, without even a reprimand.

70.     Dr. Magnuson met with Dr. Steele about these alleged "civility" concerns. He was obliged to acknowledge that Dr. Steele was being treated differently than Dr. Schweitzer would have been in the same situation.  He suggested that Dr. Schweitzer would have said "f*ck you" and ended the matter.

71.     Despite this acknowledgement, Dr. Magnuson showed no awareness of his own gender stereotyping, casting the dispute (because it involved two women) as a "woman thing."

72.     In her discussions regarding her work environment, the notion that Hopkins could avoid having to examine its own conduct by faulting *Dr. Steele's* took hold.  She was told that the problem was in *her* communication style.

73.     Hopkins provided Dr. Steele with a coach and Dr. Steele began meeting with the leadership coach assigned by Hopkins, Ellen Lent, Ph.D. ("Dr. Lent").

74.     In the course of their working together, Dr. Lent told Dr. Steele that she was concerned about the disparate treatment Dr. Steele faced and that she intended to talk to her Department about necessary changes that would support Dr. Steele in a way that was fair and appropriate.

75.     Early in 2015, Dr. Lent told Dr. Steele that she had communicated with Dr. Magnuson about the bias Dr. Steele confronted and she "gave him an example of 'baiting' in the workplace."  She sought to "give perspective" to Dr. Magnuson that what was occurring could be viewed as "harassment that can be gender-based and toxic."

76.     After Dr. Magnuson spoke with Dr. Lent, he spoke to Dr. Steele about her coach's observations.  There was nothing reflective about his reaction to Dr. Steele's coach.  Instead, her

comments triggered an angry response.  About Dr. Lent, Dr. Magnuson shot back: "Who does she think she is?"  The message was clear: Neither Dr. Steele nor anyone advocating for her should try to change things at Bayview.

77.     With Dr. Lent's support, Dr. Steele sought redress from the University.

78.     She was advised to wait for the new chair of the Department of Surgery to arrive and to seek assistance from that person.  Dr. Steele followed the advice and hoped that change was coming. On information and belief, Hopkins again declined at this time to conduct any investigation into the concerns about bias Dr. Steele expressed.

79.     The process of selecting a new chair itself, however, revealed bias. On information and belief, male surgeons failed to show up for a dinner to meet a woman candidate for the role.  About this candidate, Dr. Magnuson told Dr. Steele that "she is just like you" and that he did not know "why they bothered to invite her."

80.     Problems continued in the Department.  When a male junior faculty member acted inappropriately, his conduct was excused by departmental leadership with a shrug and a statement that he did not know how to deal with women based on "his culture."  That faculty member attended university and medical school in California.

81.     In early June of 2015, Dr. Steele met again with University leadership.  She spoke to her of ongoing concerns and also shared some devastating personal news: her young son had become critically ill.

82.     She had hoped Hopkins would be supportive.  But then, as if trying to build a record against her, on June 24, 2015, Dr. Steele received a shocking letter from the Dean's office. Without referencing the personal news Dr. Steele had shared about her son, the Dean asserted

that Dr. Steele had been so "emotional" during their meeting that Hopkins now would require her to submit to an evaluation to ensure that she was fit to continue practicing medicine.

83.     The accusation was profoundly disturbing.  To be sure, Dr. Steele had become emotional when talking about her son's rare and grave illness and the difficulties layered on to this personal challenge by having to manage the hostility in the Department at that time.  But her emotional candor about what she was facing had nothing to do with her competence in the operating room.

84.     Hopkins' decision to cast Dr. Steele as the problem as she faced an enormous personal challenge – with a gravely ill child – was made all the more clear when Dr. Lent contacted Dr. Steele to inform her that, after the coach had raised concerns about Dr. Steele's work environment and the bias she faced with University leadership, Hopkins itself had forbidden further coaching.  Dr. Lent was directed by Hopkins not to communicate with Dr. Steele at all going forward.

85.     On information and belief, Hopkins terminated the services of Dr. Lent because she believed that Dr. Steele was facing discriminatory conditions and had, as far as Hopkins was concerned, thus "lost her objectivity" and become too much of an advocate for Dr. Steele.

86.     Dr. Steele met with Dr. Magnuson about Hopkins' referral.  Even he seemed to recognize that there was *no factual basis whatsoever for the demeaning request made.* He noted that Dr. Schweitzer had cried after a difficult event, yet he was not subjected to a fitness for duty evaluation.  Dr. Magnuson told Dr. Steele to continue seeing patients and operating pending the "fitness for duty" evaluation.

87.     Dr. Steele went to the preliminary "fitness for duty" meeting on July 6, 2015.  As for the concern about Dr. Steele, the evaluator stated that she had heard from Dr. Magnuson that

Dr. Steele had been "flaunting her success" in the Department.  Dr. Steele had questions about the paperwork she was asked to fill out and reached out to the Dean.  Nobody at Hopkins ever responded, and Dr. Steele never submitted the paperwork.  The matter was dropped.

88.     Curiously, Dr. Schweitzer, around the same time, had a dangerous and inappropriate behavioral meltdown *while he was with a patient in the operating room* and, on information and belief, was never referred for a fitness for duty examination.

89.     In or around the summer of 2015, Dr. Schweitzer went out on a medical leave.  On information and belief, the terms and conditions of his employment remained the same when he returned from medical leave.  This also appears to have been the case for another (male) surgeon who went out on leave for a period of time.

90.     On July 8, 2015, Dr. Steele had her faculty review meeting with Dr. Magnuson.  He acknowledged the success of her research program.  The feedback was strange given the swirl of hostility and questioning she had faced, but Dr. Steele hoped this meant that a turn in the road was ahead, particularly because the new Chair of Surgery would begin his tenure within a week of her review.

91.     In or around the summer of 2015, Robert S.D. Higgins, M.D., ("Dr. Higgins") became the surgeon-in-chief at the Johns Hopkins Hospital, the William Stewart Halsted Professor of Surgery at the University, and director of the Department of Surgery at the School of Medicine, which includes the Department of Surgery at Bayview.

92.     When he arrived, Dr. Steele met with him.  She shared the adversity she had faced at Bayview and also that she was hopeful that the environment could and would change.  Dr. Higgins echoed prior advice, urging Dr. Steele to focus on research instead of her clinical work.

93.     Although Dr. Steele was hopeful that Dr. Higgins would provide a fresh start to pursue her clinical practice and research, the difficult circumstances at Bayview did not improve.

94.     In the summer of 2015, Dr. Steele was asked if she would be interested in taking over the Surgery Clerkship at Bayview. Dr. Steele happily accepted the offer.  But within a month, the offer was withdrawn because Dr. Higgins decided to place a different physician in that role.  On information and belief, he selected someone who had not dared to speak out against bias in the Department.

95.     The Department also further reduced Dr. Steele's clinic time and further reduced the ways in which she would attract patients to her practice.  When Dr. Steele raised concerns about the limitations effectively being placed on her clinical productivity, Dr. Magnuson admonished her not to "manhandle" him.

96.     And as though to assure that Dr. Steele would be further marginalized, the Department took steps to undermine Dr. Steele's hitherto successful research program.  Her grant funds were misapplied by Hopkins in a way that materially and inappropriately depleted the funds that grantors had expressly made available to support her efforts, and the Department fomented conflict by promoting a junior researcher's false claim of credit for research projects spearheaded by Dr. Steele.

97.     In June 2016, Dr. Steele had her annual faculty review meeting with Dr. Magnuson.  Yet again, as they sat across from one another, he did not raise concerns.  He also signed the evaluation, which listed no problems that needed to be addressed.

98.     While continuing to face challenges in carrying out her work, Dr. Steele received tough personal news.  That same month, Dr. Steele's son's medical condition took a turn for the

worse.  She was required to spend significant portions of the summer months in 2016 tending to him. Dr. Steele continued to manage her research work.

99.     But her son's condition did not improve and, in September of 2016, Dr. Steele was obliged to take FMLA leave to care for him.   Although her supervisors were well aware of the circumstances, two days after Dr. Steele initiated her leave, she received an invitation to a meeting with Drs. Higgins, Schweitzer, Magnuson, and 4 other department members.  It was entitled "Faculty Review."

100.    Dr. Steele contacted Dr. Magnuson to ask about the agenda and he indicated that Dr. Higgins wanted to discuss her research program.  Although she was out on leave, she understood the topic to be reasonable in terms of departmental planning.  She agreed to attend.

101.    Dr. Steele went to the meeting, with her research collaborator and primary mentor, believing he would be an important participant in their discussion, given the stated agenda.  Yet, upon their arrival, Dr. Higgins refused to let Dr. Moran attend.  Dr. Higgins rejected his participation in the meeting, stating – contrary to the representation made to Dr. Steele – that this was not about research and that he could not attend.

102.    Dr.  Steele was sat down at the meeting and derided for being "disruptive" within the department.   At one point, Dr. Schweitzer stood up, lunged towards Dr. Steele, yelled, and slammed his fist down on the table.  Dr. Steele got up to leave in the face of this repeat of aggressive conduct but, without admonishing Dr. Schweitzer, but Dr. Higgins ordered her to sit back down.

103.    When Dr. Steele noted that, just weeks earlier, she had participated in a review where no such concerns had been raised, Dr. Higgins produced a bogus, revised review, without her signature.

19

104.   On information and belief, Dr. Steele's positive review was – against the norms at Johns Hopkins – rewritten to serve the purpose of this meeting: to rattle her so that she would go out on leave and not return.

105.   After insisting that Dr. Steele come in for a meeting during her leave, at its close, Dr. Higgins told Dr. Steele to "go home to her family and tend to her business."

106.   That the department sought to isolate Dr. Steele became even clearer after the meeting: In addition to refusing to allow a senior faculty member who served as Dr. Steele's mentor and collaborator to attend the meeting, Dr. Higgins informed another academic mentor, collaborator and senior faculty member at Hopkins warning him to stay out of matters involving Dr. Steele.

107.   The treatment of Dr. Steele stood in sharp contrast to the Departmental embrace of a male colleague who was accused of serious scientific misconduct at around the same time. On information and belief, he was not accused of being "disruptive" nor did he have his place in the Department called into question.  Instead, he was subsequently promoted in faculty rank.

108.   During the fall of 2016, while she was still on leave tending to her son, Dr. Steele reached out to Hopkins leadership to try to remedy the situation in which she found herself.  On information and belief, Hopkins once again declined at this time to conduct any investigation into the concerns about bias Dr. Steele expressed.

109.   On December 30, 2016, Dr. Steele emailed Dr. Higgins to request an additional leave of absence to continue caring for her son, who was going through chemotherapy.  She heard nothing for a month.

110.   Finally, on January 30, 2017, Dr. Higgins and Dr. Magnuson provided proposed terms of the leave of absence.  The offered terms required that she take the leave with no

guarantee that her faculty position would remain when she returned and that she give up her clinical privileges.

111.    Cynically and quite terribly, it appears that Hopkins saw her family's tragic circumstances as an opportunity to get rid of Dr. Steele. Given the terms offered and Dr. Higgins' rejection of any sort of modifications, with adverse consequences to her nearly assured if she attended to her son, Dr. Steele arranged care for her son and returned to work.

112.    On information and belief, this offer reflected disparate treatment of Dr. Steele. Others at Johns Hopkins had been treated much more generously in circumstances where an extended leave was required, and their positions had been protected.

113.    Once back at Bayview, Dr. Steele faced a circumstance now where not only her clinical but her research programs were in disarray — with funds that were to be devoted to her research program allowed by Hopkins to be taken over by others.

114.    In light of the problems created in her absence and the misuse of grant funds that had been permitted, Dr. Steele began her time back working full time to relaunch her research as well carrying out research duties under her NIH grant.

115.    Dr. Magnuson asked to meet to discuss her plans.   The two met and discussed the priorities with respect to Dr. Steele's research program and her clinical practice.  They agreed that she was relieved of clinical obligations to allow her to focus on her research program.  Dr. Steele was thus not assigned *any patients* by Dr. Schweitzer during this time.

116.    Dr. Steele got to work on her research program and, with another Hopkins faculty member and collaborator, she developed a proposal for The Johns Hopkins Children's Center's Comprehensive Approach to Child and Adolescent Health ("COACH") program.  Dr. Steele hoped that the COACH program would allow her to build on her expertise and research and also

escape the toxic environment at Bayview to reset her career at Johns Hopkins Hospital.  In

March of 2017, she sent Dr. Higgins an email about this proposal.  He did not respond.

117.    Then, on March 29, 2017, Dr. Steele received an email from Dr. Higgins, copying

a Hopkins dean.  The subject line was "extension of time."  Attached to the email was a formal

communication stating that, because of her protected leave of absence, Dr. Steele would not

receive the normal two-year reappointment but be reappointed for a slim three months.

118.    Thereafter, on April 25, 2017 Dr. Steele met with Dr. Higgins and 3 other

department members.  While acknowledging her accomplishments and promise, he chastised her

for not being a "team player" and for being "disruptive" of dynamics in her workplace.

119.    He did so notwithstanding the powerful collaboration evidenced in the COACH

proposal on which Dr. Steele had worked and for which she was advocating at that very time.

120.    He further criticized her absence of clinical productivity since her return,

seemingly unaware that Dr. Magnuson had agreed that she should focus on reinvigorating her

research program before resuming active clinical practice.

121.    Indeed, it was not until *after her meeting with Dr. Higgins* that Dr. Magnuson told

Dr. Steele that she should return to clinical practice.

122.    On May 26, 2017, the day after her return to clinical practice by agreement with

the Department, she met with Drs. Magnuson and Higgins.  They handed her a terminal two-year

contract.

123.    As for *why* they did this, Dr. Steele was told that she had failed to assimilate back

into the Department following her leave.  Dr. Higgins suggested that Dr. Steele had a long

history of failing to abide by the Department's "rules."

124.    Dr. Steele asked to understand what he meant by this notion that she failed to play by the rules.  Dr. Higgins offered no specifics but told Dr. Steele that she simply "did not fit" in at Bayview.

125.    The process in which Hopkins engaged in the spring of 2017 was not consistent with Hopkins' contractual obligations to Dr. Steele.  If the institution wanted to terminate her appointment, she needed to be informed within a certain period of time prior to her renewal date. That did not happen – and likely Hopkins wanted to avoid the optics of that coming immediately upon her return from leave, as it did.

126.    Hopkins *should have* given Dr. Steele another two-year contract, and only at the end of *that contract period* could they provide her with a terminal contract, according to the University rules and bylaws for the treatment of Associate Professors.

127.    Dr. Steele was devastated upon receiving the terminal contract.  Although she had certainly felt dispirited by her treatment by the Department, she had been hopeful that the COACH program would allow her to hit reset and work with wonderful colleagues on an important program for adolescents and children.

128.    Although the contract was "terminal," Dr. Higgins assured her over time that this would be revisited and she could well remain.

129.    Dr. Steele thus worked to reintegrate into clinical practice.  Her efforts were made all the more difficult by the fact that the leadership in her Department continued to telegraph their view of her place at Hopkins.

130.    On information and belief, one administrator canvassed administrative staff after a few weeks, asking about any possible "problems" with Dr. Steele; Dr. Schweitzer intervened to keep a new – and talented – nurse practitioner from working with her; and a physician asked a

nurse practitioner whether she had been asked to "spy" on Dr. Steele and report back what she could.

131.    Also on information and belief, patients continued to be steered away from Dr. Steele, so as to confirm what Hopkins wanted: a reason to terminate her for a lack of clinical productivity.

132.    Dr. Steele's objective work, even in this environment, was sufficiently strong that, in the context of her review with Dr. Magnuson in September of 2017, he once again did not raise any issues with her performance.  Instead, and rather strangely in fact, Dr. Magnuson signed off on Dr. Steele's goals of being promoted to full professor, securing additional NIH RO1 funding, and establishing the COACH program.

133.    Dr. Steele tried to chart a path forward, even with the hostility she faced.  At the suggestion of a colleague, she met again with the senior leadership of the School of Medicine. She was promised an investigation into the circumstances of her terminal contract.

134.    On information and belief, no such investigation ever occurred.

135.    As though to lull Dr. Steele into believing that matters could be rectified internally – and thus letting the time lapse to exercise her rights – Hopkins promised to revisit the decision made in May of 2017 and raised the possibility that Dr. Steele could be placed in a clinical research position and that it could support the COACH Program that she and her collaborator wished to advance.

136.    In fact, in the fall of 2017, Dr. Higgins met with Dr. Steele and informed her of his view of those possibilities and that he believed she could "earn" her way back, admitting that she alone was not at fault for the dynamics at Bayview.  She left in buoyed spirits, trusting Dr. Higgins' sincerity in that moment.

137.    Despite the hopeful signals from Dr. Higgins, Dr. Schweitzer was committed to ensuring that Dr. Steele could not succeed.

138.    Animated by his anger that she had dared to call out his biased and retaliatory conduct, Dr. Schweitzer made it clear to all – administrators and professional staff alike – that Dr. Steele was to be marginalized and essentially no longer viewed as a member of the Department.  This occurred through various ceremonies of exclusion and also in the way he treated her role in various research projects that were critical to her development and her ability to move forward professionally, whether at Hopkins or elsewhere.  He also continued to squeeze her out of meaningful clinical work and to disparage her to her clinical colleagues.

139.    Dr. Steele heard nothing substantively from Dr. Higgins for a period of months.  Then, in March of 2018, Dr. Steele met again with Dr. Higgins and several department members.  The promises he had made and the possibilities he had offered were not on his agenda.

140.    When Dr. Steele again raised concerns to Hopkins administrative leadership, there was no promise to investigate; no constructive thoughts on redress and no support.  Instead, she was asked – rather cruelly and bluntly – why she remained at an institution that treated her in this fashion.  Why, she was asked, did she simply not leave.

141.    The question was asked notwithstanding some basic realities of which Hopkins was well-aware: Dr. Steele's spouse is a long time faculty member at Hopkins; her child's medical care for a rare life threatening illness is centered at the institution and her research collaborators are there as well. In addition, faced with discriminatory bias and retaliation, she did not believe that it was she who should be uprooted.

142.    Dr. Steele filed a charge of discrimination on March 22, 2018.

143.    By June of 2018, on information and belief, Hopkins was aware of the filing.

144.    Subsequent to the filing, the retaliatory and biased exclusion of Dr. Steele from the Department and the degradation of her professional standing continued.

145.    The atmosphere at Bayview also remained stubbornly biased.  For instance, in the spring of 2018, notwithstanding Dr. Steele's expression of concerns, a male colleague made a biased comment directly to her about another senior woman physician who was being replaced. He posited that the action was taken "probably because of her chromosomes and because she is fat."

146.    In June, Dr. Steele was approached by a junior faculty member concerned about discrimination that she had been facing.  She was being treated like a secretary by her boss and when she raised concerns about it, he told her to "f--- off."  Dr. Steele learned that these events had been reported to Hopkins Office of Institutional Equity, which had apparently investigated and concluded that the woman was a "liar" and difficult to work with.  This young woman, like Dr. Steele, and apparently others before her, was being gas-lighted.  They raised concerns and they themselves became the problem.

147.    Yet despite all of this, Dr. Steele pressed forward with work and earned further recognition and support for her research.  In August of 2018, Dr. Steele was awarded a grant from private industry.

148.    That same month, a site review of the Department was conducted for reaccreditation of the adult and adolescent bariatric program.  Cynically, given his treatment of and plans for Dr. Steele, for purposes of reaccreditation, Dr. Schweitzer relied on *her* patient census and her accomplishments to demonstrate how effective the program is for adolescents.

149.    Also in August 2018, Dr. Steele had her annual review with Dr. Magnuson. There, Dr. Steele again raised concerns about the insufficient block time she was allotted to see

26

her patients, and the few referrals she was receiving from Dr. Schweitzer.  Dr. Magnuson

promised to help Dr. Steele with securing additional patients, but that never occurred.

150.    At the end of the meeting, Dr. Magnuson claimed to not have time to finish and

sign Dr. Steele's review.  Curiously, the review she then was sent was different from what had

been discussed and – in another head-spinning turn – misrepresented what they in fact had

discussed.  The review was strangely called a "Supplement" and it did not accurately portray the

conversation Dr. Steele had with Dr. Magnuson.  Instead, it attempted to suggest that Dr. Steele

– with full and appropriate support – had somehow failed to meet the target set for her clinical

productivity.  The Supplement was, once again, false and misleading.

151.    In December of 2018, Dr. Steele and a collaborator presented their vision for an

Adolescent Bariatric Program at the Johns Hopkins Children's Center to its Advisory Board and

President of the hospital.  Dr. Steele met with members of the Johns Hopkins Children's Hospital

about locating the COACH program there.  On February 21, 2019, the administrator for the

Children's Center wrote her back regarding a potential "path forward," involving the

presentation of a formal business plan and a detailed vision statement including how the program

would be integrated into the Children's Center.

152.    But Hopkins elected not to move forward with the COACH program, after

purportedly engaging in a process to evaluate its financial effect.  On information and belief, the

financial modeling done was skewed so as to provide a seemingly neutral reason not to permit

the COACH program to move forward – with Dr. Steele remaining at Hopkins.  Hopkins thus

foreclosed Dr. Steele's efforts to remain at the institution in a different role and work

environment.

153.    Since that time, Hopkins has continued its retaliatory campaign against Dr. Steele.

27

154.    Dr. Steele was required to stop seeing patients at Bayview in the late spring of 2019 and her appointment, which allowed her to continue her research activities, ended on December 15, 2019.

155.    During the course of her terminal appointment, Dr. Steele actively sought a new position outside of Johns Hopkins.  Time and again, she has had positive inquiries go cold, on information and belief, after contact with Hopkins.

156.    She has suffered and will continue to suffer significant economic damages as well as emotional distress based upon the treatment of the Defendants.

**COUNT ONE**
**Gender Discrimination Under 42 U.S.C. § 2000 et seq.**
**(Title VII of the Civil Rights Act of 1964, As Amended)**
**JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW**

157.    Paragraphs 1 through 156 of this complaint are incorporated herein by reference.

158.    The Defendants, acting jointly and severally, through the acts and omissions described above, *inter alia*, have unlawfully discriminated against Dr. Steele because of her gender, taking adverse actions against her, declining to investigate her concerns and a hostile work environment, in violation of 42 U.S.C. § 2000 *et seq*. (Title VII of the Civil Rights Act of 1964, as amended).

159.    All administrative and jurisdictional prerequisites to bringing this action under 42 U.S.C. § 2000 *et seq*. have been met.

160.    As a result of the Defendants' discriminatory conduct, Dr. Steele has suffered and continues to suffer damages including, but not limited to, loss of compensation and professional opportunities, other financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

## COUNT TWO
### Gender Discrimination Under Md. Stat. S.G. §§ 20–101 et seq.
### JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW

161.    Paragraphs 1 through 160 of this complaint are incorporated herein by reference.

162.    The Defendants, jointly and severally, through the acts and omissions described above, *inter alia*, have unlawfully discriminated against Dr. Steele because of her gender, taking adverse actions against her, declining to investigate her concerns and creating a hostile work environment, in violation of Md. Stat. S.G. §§ 20–101 *et seq*.

163.    All administrative and jurisdictional prerequisites to bringing this action under Md. Stat. S.G. §§ 20–101 *et seq*. have been met.

164.    As a result of the Defendants' discriminatory conduct, Dr. Steele has suffered and continues to suffer damages including, but not limited to, loss of compensation and professional opportunities, other financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

## COUNT THREE
### Retaliation – Under 42 U.S.C. § 2000 et seq.
### (Title VII of the Civil Rights Act of 1964, As Amended)
### JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW

165.    Paragraphs 1 through 164 of this complaint are incorporated herein by reference.

166.    The Defendants, jointly and severally, through the acts and omissions described above, *inter alia*, have retaliated against Dr. Steele, taking adverse actions against her, declining to investigate her concerns and creating a hostile work environment, for her having opposed practices that she reasonably believed were forbidden by 42 U.S.C. § 2000 *et seq*. (Title VII of the Civil Rights Act of 1964, as amended) in violation of 42 U.S.C. § 2000 *et seq*. (Title VII of the Civil Rights Act of 1964, as amended).

167.    All administrative and jurisdictional prerequisites to bringing this action under 42

U.S.C. § 2000 *et seq.* have been met.

168.    As a result of the Defendants' unlawful conduct, Dr. Steele has suffered and will

suffer damages including, but not limited to, loss of compensation and professional

opportunities, other financial losses, loss of personal and professional reputation, pain and

suffering, and emotional distress.

## COUNT FOUR
### Retaliation – Under Md. Stat. S.G. §§ 20–101 et seq. –
### JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW

169.    Paragraphs 1 through 168 of this complaint are incorporated herein by reference.

170.    The Defendants, jointly and severally, through the acts and omissions described

above, *inter alia*, have retaliated against Dr. Steele, by taking adverse actions against her,

declining to investigate her concerns and by creating a retaliatory hostile work environment, for

her having opposed practices that she reasonably believed were forbidden by Md. Stat. S.G. §§

20–101 *et seq.*, in violation of Md. Stat. S.G. §§ 20–101 *et seq.*

171.    All administrative and jurisdictional prerequisites to bringing this action under

Md. Stat. S.G. §§ 20–101 *et seq.* have been met.

172.    As a result of Johns Hopkins, the Health System, and Bayview's, unlawful

conduct, Dr. Steele has suffered and will suffer damages including, but not limited to, loss of

compensation and professional opportunities, other financial losses, loss of personal and

professional reputation, pain and suffering, and emotional distress.

## COUNT FIVE
### Retaliation – Family and Medical Leave Act, 29 U.S.C. § 2601, et seq., –
### JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW

173.    Paragraphs 1 through 172 of this complaint are incorporated herein by reference.

174.    All Defendants, jointly and severally, acting through the acts and omissions described above, *inter alia*, have retaliated against Dr. Steele for exercising her substantive FMLA rights, and opposing practices made unlawful by the FMLA, in violation of 29 U.S.C. § 2601, *et seq*.

175.    As a result of the Defendants' unlawful conduct, Dr. Steele has suffered and will suffer damages including, but not limited to, loss of compensation and professional opportunities, other financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

**COUNT SIX**
**Breach of Contract –**
**JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW**

176.    Paragraphs 1 through 175 of this complaint are incorporated herein by reference.

177.    A contract or contracts existed between Dr. Steele and Johns Hopkins, as governed by the University rules and bylaws for the treatment of Associate Professors.

178.    The Defendants, acting jointly and severally, through the acts and omissions described above, *inter alia*, have unlawfully breached this contract or contracts.

179.    As a result of the Defendants' unlawful conduct, Dr. Steele has suffered and will suffer damages including, but not limited to, loss of compensation and professional opportunities, other financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

**COUNT SEVEN**
**Tortious Interference with Contractual and Prospective Economic Relations –**
**JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW**

180.    Paragraphs 1 through 178 of this complaint are incorporated herein by reference.

181.   Dr. Steele had economic relationships and prospective economic relationships with potential employers, potential patients, actual and potential funders for her research, and potential collaborators on her research projects.

182.   The Defendants, through the acts and omissions described above, *inter alia*, have maliciously, intentionally, willfully, and without justification interfered with Dr. Steele's economic relations with these potential employers, patients, collaborators, and actual and potential grantors, with the intent to cause harm to Dr. Steele.

183.   As a result of the Defendants' unlawful conduct, Dr. Steele has suffered and will suffer damages including, but not limited to, loss of compensation and professional opportunities, other financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

## COUNT EIGHT
### Intentional Infliction of Emotional Distress –
### JOHNS HOPKINS, HEALTH SYSTEM AND BAYVIEW

184.   Paragraphs 1 through 185 of this complaint are incorporated herein by reference.

185.   The Defendants, through the acts and omissions described above, *inter alia*, intentionally engaged in extreme and outrageous conduct for the purpose of harming Dr. Steele's professional career and inflicting emotional distress upon her.

186.   Defendants' extreme and outrageous conduct includes, in addition to the conduct outlined above, *inter alia*, the following:

- Taking advantage of Dr. Steele's need to take an FMLA-protected leave to care for her son—suffering from a life threatening illness—as a means to further punish and retaliate against her for complaints of gender discrimination and retaliation and for taking a protected leave, in an effort to prevent her returning to her employment with Defendants;

- Using the occasion of Dr. Steele meeting with senior administration and raising concerns about discrimination and retaliation in the Department, and her sharing the details and difficulties of her son's life threatening medical condition, as a reason to question her

fitness to practice medicine and to forbid her further work with a professional coach who agreed that Dr. Steele was subjected to gender discrimination and retaliation;

- Subjecting Dr. Steele to an ongoing and years-long course of abuse, harassment, discrimination, retaliation, and gaslighting in the Department of Surgery at the hands of Dr. Schweitzer, Dr. Magnuson, and Dr. Higgins, and other leadership, despite her repeated complaints;

- Deliberately interfering with and undermining Dr. Steele's clinical practice to deprive her of patients and then claiming that she was not clinically productive;

- Deliberately interfering with and undermining Dr. Steele's research projects by misallocating her funds, failing to pay invoices, undermining her with staff, and assigning credit for her research projects to junior researchers in a deliberate effort to marginalize and undermine Dr. Steele.

187.    As a result of the Defendants' conduct, Dr. Steele has suffered severe emotional distress, for which she has sought counseling.  Defendants' conduct has also harmed Dr. Steele's relationship with her husband.  As a result, Dr. Steele has also suffered the related loss of compensation and professional opportunities, other financial losses, loss of personal and professional reputation, and pain and suffering.

WHEREFORE, the Plaintiff respectfully prays that this Court:

a.    Enter a judgment in her favor on all counts of this Complaint;

b.    Award her all damages she proves at trial to have suffered, including, *inter alia,* compensatory damages and consequential damages, for back pay and loss of future earnings and harm to reputation, and damages for emotional distress, physical and mental suffering;

c.    Award her attorneys' fees, costs and interest;

d.    Award her punitive damages;

e.    Order her reinstatement; and

f.    Award her such other relief as the Court deems just and proper.


**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL MATTERS SO TRIABLE.**

Respectfully Submitted
**Kimberley Eden Steele, M.D., Ph.D.**
By her attorneys,


Joseph B. Wolf (Fed. Bar No. 27882)
  joseph@luchanskylaw.com
Bruce M. Luchansky (Fed. Bar No. 08439)
  lucky@luchanskylaw.com
**LUCHANSKY MILLMAN**
606 Bosley Avenue, Suite 3B
Towson, Maryland 21204
Telephone: (410) 522-1020
Facsimile: (410) 522-1021


Ellen J. Zucker
  ezucker@burnslev.com
Aaron S. Welo
  awelo@burnslev.com
(*pro hoc vice applications filed on this date*)
Burns & Levinson LLP
125 High Street
Boston, Massachusetts 02110
Telephone:  617-345-3000
Facsimile:  617-345-3299


4827-4636-4335.2